COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-06-418-CV

 

 

DOLORES
ZARNOW, AS                                                       APPELLANT

ADMINISTRATOR
OF THE ESTATE

OF ALLEN ZARNOW, M.D., DECEASED                                                   

 

                                                   V.

 

CLINICS OF NORTH TEXAS                                                      APPELLEE

 

                                              ------------

 

             FROM
THE 30TH DISTRICT COURT OF WICHITA COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I.  Introduction








In seven issues, Appellant
Dolores Zarnow (ADolores@), as Administrator of the Estate of Allen Zarnow, M.D., Deceased (ADr. Zarnow@) asserts
that the trial court erred by granting the motions for summary judgment of
Appellee Clinics of North Texas (Athe Clinic@). 

II.  Factual and Procedural Background

A.  Dr. Zarnow and the Clinic 

Dr. Zarnow was a partner and
a physician-employee of the Clinic from the fall of 1995 until his termination
in July 1999.  The Clinic operated
medical facilities at various locations in Wichita Falls; Dr. Zarnow practiced
rheumatology at the Tenth Street location.

Because of the nature of his specialty,
Dr. Zarnow routinely required diagnostic studies and lab services, such as
blood tests and liver function tests, in the treatment of his patients.  According to Dr. Zarnow, the Clinic=s policies required diagnostic studies and lab work for Clinic
patients to be done at the Clinic facilities by Clinic employees.  On numerous occasions, however, Dr. Zarnow
referred patient lab work to laboratories outside the Clinic because of what he
considered to be slow turnaround times and inaccuracies in their studies.  He chronically complained about this problem
to Clinic executives.  However, according
to the Clinic, no Clinic policy required in-house diagnostic studies and lab
work, but the Clinic did favor the use of its facilities, employees, and
partners when consistent with the medical needs of its patients.








In 1996, the Clinic sold its
assets to Phycor, Inc. for more than $30 million.  Dr. Zarnow consented in writing to the sale,
and he received $423,904.86 for his share. 
Phycor was a management company and ran the day-to-day business side of
the practice.  All matters involving the
delivery of medical care remained within the discretion of medical
doctors.  All nurses and administrative
and management personnel, including Deanna Kyle, Linda Bruno, and Jim Resendez,
were employees of Phycor.

Clinic members objected to
Dr. Zarnow=s practice
of referring patients to outside facilities because of the effect it had on Clinic
revenues.  Dr. Zarnow=s referral practice was discussed in Phycor and Clinic executive
committee meetings.  Several physicians
on the Clinic=s executive
committee personally encouraged Dr. Zarnow to use Clinic labs and diagnostic
tools.  After a committee meeting in
January 1997, two Clinic partners told him that the Clinic would reduce his
salary if he continued sending lab work to outside facilities, and he was
accused of not supporting the Clinic financially.  In 1999, an executive committee member told
him that the Clinic was trying to get rid of him because of his complaints
about the way things were run within the Clinic and his outside referrals.  Dr. Zarnow continued his use of outside
laboratories and radiologists because he said he believed that practice to be
in the best medical interest of his patients.








B.  The Criminal Investigation

Dr. Zarnow=s medical office was located in a large medical clinic building that
contained many other physician offices and was visited by many patients.  According to the Clinic, it had in place for
a long time a Ano-firearms
policy,@ which prohibited the possession of any firearms on any Clinic
premises and at any Clinic facility.  Dr.
Zarnow, an avid gun collector, acknowledged that he was aware that the Clinic
had a no-firearms policy and that there was a sign posted on the door to his
medical building prohibiting firearms.

Dr. Zarnow generally kept his
gun collection at his residence but on occasion he moved some munitions to his
office, under lock and key, to secure them from potential flooding at his
home.  Some firearms had been kept in his
office desk for ten years, and Dr. Zarnow claimed several physician partners
knew that he kept guns in his office.  At
times Clinic personnel signed for deliveries of ammunition.

On July 1, 1999, Dr. Zarnow
left town for a two-week vacation with his family.  He was scheduled to be gone until July 13,
1999.  When he returned, a baseboard on
his office desk looked like it had been pried off, and an extra key to the desk
that he had hidden in a prescription bottle was missing.  His nurse, Kyle, and the site manager, Bruno,
were the only other persons with a key to his office.








A week before Dr. Zarnow was
to return from vacation, Kyle and Bruno claimed that they found a gun in his
desk, but they left the gun there.  Nurse
Kyle told the Clinic CEO, Dr. Larry Lyford, about the find.  Dr. Lyford went to Dr. Zarnow=s office and said that he saw several guns, which he placed in a
filing cabinet.  He told James Resendez,
the executive director for the management company, that guns had been found in
Dr. Zarnow=s office and
that the executive committee needed to respond quickly.  Resendez asked Kyle if she was aware of
anything else in Dr. Zarnow=s office.  She said she opened a
drawer in his desk and discovered that it contained fuses.

The executive committee
grappled with what to do about the find. 
Resendez told the executive committee that he saw something related to
munitions and that it was not good, though he did not know what it was.  He recommended that the committee immediately
terminate Dr. Zarnow.  Some wanted to act
immediately; others wanted to wait until Dr. Zarnow returned. They decided to
contact their attorney, Gene Douglass, and to have the locks to Dr. Zarnow=s office changed.  Once the
locks were changed, only Bruno and Resendez were allowed keys, but at no time
was the building evacuated.

On July 13, 1999, Dr. Zarnow
called his nurse to tell her his return would be delayed.  Resendez was present when she received the
call, but neither one discussed or even mentioned the issue of the munitions to
Dr. Zarnow.













The Clinic=s attorney, Douglass, ultimately contacted the Wichita Falls Fire
Department and reported the discovery of firearms and Apossibly explosive materials.@  Fire and police were
dispatched to the Clinic to investigate. 
Eventually, the search investigation involved the FBI, ATF, Customs,
Fort Worth Bomb Disposal, and Fort Sill Army Explosive Ordnance Disposal
personnel.  When the firemen arrived, no
one appeared to be in distress, and Resendez directed them to Dr. Zarnow=s office.  Resendez informed the
fire personnel, AThere was
some explosives.@  Fireman Nicholason, a former Army Ordnance
man, told his chief that a detonation cord was found, Awhich is more powerful than a fuse and is an explosive device.@  Nicholson told police
representatives that the items discovered were dangerous because the blasting
caps were already crimped to what he thought was a detonator cord.  Fire Chief Lindsay stated in his deposition
that it was reasonable, under the circumstances, for Resendez to want the items
removed from the building.  The fire
chief told Resendez that there was no immediate hazard or imminent
emergency.  He advised Resendez that he
could wait until the doctor returned to call the Emergency Ordnance Disposal
Team from Fort Sill to remove the items. Resendez wanted the items out of the
building and asked about evacuating the building.  The fire chief went ahead and called the
Ordnance Disposal Team from Fort Sill. 
He told Resendez that if it would make him feel better, he could clear
the area.  At the time the area was
occupied by one nurseCKyle.  Kyle was told she could go home, but Bruno
told her to stick around.  The fire chief
was not sure how the situation escalated.

Based upon information that
he received from police conducting a search of Dr. Zarnow=s desk, Police Officer Dilbeck was directed by his police superiors to
prepare a search warrant for a locked filing cabinet in Dr. Zarnow=s office.  Dilbeck stated in his
disposition that he believed that the criminal offense of possession of a
prohibited weapon, explosive device, had been committed because of the
discovery of the cannon fuse/detonation cord, but he never talked to anyone
associated with the Clinic.  Dilbeck
prepared the search warrant affidavit and presented it to a magistrate, and the
search warrant for the filing cabinet was issued.  A firearm and a switchblade knife were discovered
in the filing cabinet.








According to Dr. Zarnow,
investigating police officers arrived at the Clinic, having been advised that
explosive material was found in the office. 
Kyle was taken to the police station to be interviewed and told an
investigating officer that Dr. Zarnow was a loner, that he demanded that his
office and exam rooms be locked at all times, that he had a rocket launcher,
that he was very anti-President Clinton, that he was extremely opposed to the
local hospital merger, that he said that it would be easy to bomb these
facilities, that he detonates homemade bombs from an unknown location in
Oklahoma, that he admitted having silencers for machine guns at his home, and
that he is very moody, possibly manic depressive.

In his statement to police,
Resendez said that he heard that Dr. Zarnow was a gun salesman and that he had
just bought a truck big enough to carry a rocket launcher.  Bruno told officers that the executive
committee told her to look around Dr. Zarnow=s office while the locks were being changed.  She said that during that search she found
guns, a sawed-off shotgun, blasting caps, and a cannon fuse.  She told Resendez what she found and he then
called the Clinic lawyer.

Based on the statements of
Kyle, Bruno, and Resendez, along with the discovery of material in Dr. Zarnow=s desk, police officers prepared and obtained a search warrant for Dr.
Zarnow=s residence because they believed that more explosives could be found
there.  According to the search warrant,
Dr. Zarnow could have been storing up explosives at his residence, his
residence was booby-trapped, and his whereabouts were unknown.  The warrant stated that this information came
from a female employee that worked with Dr. Zarnow.








A tactical team sent to watch
Dr. Zarnow=s house
discovered that he was at home and advised him that there was something going
on at the Clinic.  Dr. Zarnow went to the
Clinic to find out what was happening. 
He was told that suspicious items were found in his office.  He voluntarily went to the police station to
be interviewed.  Though Dr. Zarnow seemed
puzzled and confused, he was cooperative. 
He even advised the officials that he had more weapons at his house and
other licensed firearms.  When Dr. Zarnow
objected to an impromptu search by police officers, he was served with the
search warrant for his premises.  All of
Dr. Zarnow=s firearms
and munitions were confiscated.     A
cache of numerous weapons of various kinds was found, as well as five
containers of Thermite[2],
threaded pipes and caps, 180B200 blasting caps, both fuse and electric types, five pounds of
powdered aluminum, 200 pounds of nitrate, methane binary explosives, a
detonating plunger, explosive booby traps, thirty blasting caps, a cannon fuse,
and a projection device for grenades.  It
was this last item that was believed to be a prohibited weapon.  








Officer Keethler=s superiors directed him to prepare an arrest warrant, and he did
so.  He presented his affidavit to
members of the Wichita County District Attorney=s Office, who reviewed the affidavit and advised that Dr. Zarnow was
in violation of the penal code for possession of a prohibited weapon and
directed that he obtain an arrest warrant from Judge Little.  Officer Keethler believed that the grenade
launching device found in Dr. Zarnow=s home was a prohibited weapon; that he committed the offense of
possession of a prohibited weapon; and that he should have been indicted.  Based upon the munitions finding and
statements of Clinic employees, the arrest warrant was issued.  On July 14, 1999, Dr. Zarnow was arrested and
charged with a prohibited weapon offense, a third degree felony.  He spent three days in jail; however the
Wichita County Grand Jury declined to indict Dr. Zarnow for the alleged offense.

The police also attempted to
charge Dr. Zarnow for illegal possession of bomb-making equipment.  Dr. Zarnow told the officers that he never
said that he was going to blow up the hospital because of the merger.  At her deposition, Kyle denied making some of
the statements that appeared in the search warrant and arrest warrant,
including the statement that Dr. Zarnow made a bomb threat.  On July 20, 1999, a couple of officers
returned to the Clinic to talk with staff about the bombing allegations, but
officers were unable to substantiate the alleged threat.








In his deposition, Dr. Zarnow
admitted that he had no basis to believe that anyone associated with the
Clinic, as opposed to Phycor, told investigative officials that the items discovered
at his Clinic office were explosives.  He
testified that the police seized items from his office which the police
believed to be explosives and that the Clinic had an obligation to protect
workers and patients from hazards; that the Clinic Executive Committee and
physicians had the right to decide that no guns or ammunition would be allowed
on Clinic premises; that the Clinic had the right to have a no-firearms policy;
that if there was such a policy, and if such items were discovered on Clinic
premises, the Clinic would have the right to advise police and have the items
removed; and that if anyone saw items on Clinic premises which they believed to
be dangerous and failed to report this to police or fire personnel, that such
conduct would be irresponsible.  The only
person Dr. Zarnow knew to have told investigative personnel that he possessed a
prohibited weapon was Phycor employee Resendez.

C. The Termination








On July 15, 1999, the Clinic
told Dr. Zarnow that he was suspended as a partner pending further
investigation.  Dr. Zarnow was also
barred from entering the Clinic facility and told to remove his personal
belongings.  On that day he was scheduled
to see patients, but when patients showed up for their appointment, they were
told that Dr. Zarnow was not available. 
They were not told how to contact Dr. Zarnow or offered care from
another physician. According to Dr. Zarnow, he was denied access to patient
records and patients= contact
information, and the Clinic cancelled his participation with Medicare and
BlueCross HMO as a medical services provider. 
A few days after the arrest, Resendez held a news conference outside the
Clinic and stated that Dr. Zarnow was no longer associated with the Clinic.

D. Dr. Zarnow=s Damages

Following these events, Dr.
Zarnow began receiving psychiatric treatment from Dr. Harvey Martin.  Dr. Martin diagnosed acute situational
reactive depression and prescribed medication for the depression and anxiety.  Dr. Zarnow had nightmares and difficulty
sleeping.  As a result of the negative
publicity accompanying the charge brought against him, Dr. Zarnow alleged that
he suffered injury to his reputation as a citizen and medical doctor.  He alleged that agents of the Clinic and
investigating officers provided false statements to the public in media
interviews given in relation to his arrest, and these false statements misled
the police into arresting him and subjected him to public ridicule.  His children were teased at school and were
embarrassed to be seen with him in public, and he became alienated from each of
his daughters.  For an extended period of
time following Dr. Zarnow=s arrest,
his wife was extremely upset and continually crying, and she had difficulty being
with Dr. Zarnow on a personal level and withdrew from him.

 

 

 








E.  Dolores=s Causes of Action 

Dolores[3]
sought to recover damages resulting from the breach of contract and tortious
conduct by the Clinic.  First, Dolores=s first amended petition sought a declaratory judgment and alleged the
following causes of action: malicious prosecution, intentional infliction of
emotional distress, invasion of privacy, tortious interference, fraudulent
inducement, and breach of contract. 
Dolores claimed breach of contract based on events occurring while Dr.
Zarnow was still working for the Clinic and when Dr. Zarnow was ousted.   

1. The Partnership
Agreement Expulsion Provision   








Dr. Zarnow was a Clinic
partner and he signed a partnership agreement. Section 10.02 of the partnership
agreement provided that a partner may be expelled without cause by a two-thirds
vote of the partners.  Dr. Zarnow
acknowledged that the partnership had the absolute right to oust him from the
partnership without cause and that he believed he was ousted from the
partnership without cause.  Dr. Lyford
testified that Dr. Zarnow was terminated at the July 1999 partnership meeting
by a vote of more than two-thirds of the partners.  On July 27, 1999, the partnership exercised
its rights to purchase Dr. Zarnow=s capital account, and he accepted the check.

2. Breach of Contract
Claims








Dolores alleged that the
Clinic breached its contract with Dr. Zarnow by illegally and wrongfully
suspending him from practicing at the Clinic and by illegally ousting him from
the practice of medicine.  Dolores
further claims that the Clinic breached agreements with Dr. Zarnow long before
he withdrew from any association with them by: (1) demanding that Dr. Zarnow
refer all laboratory work inside the Clinic; (2) failing to provide Dr. Zarnow
with a reasonable and necessary accounting for claimed expenses and/or changes;
(3) failing to provide reasonable management services; (4) paying unreasonable
amounts for administration costs, salaries, and expenses, resulting in
inadequate compensation to the individual Aphysician-employees@ of the Clinic; (5) failing to provide reasonable and necessary
office, technical, and secretarial assistance, supplies, equipment, and such
other facilities, services, and/or staff as was reasonably necessary for him to
properly treat his patients with quality care; (6) failing to provide a
sufficient number and quality of staff, including adequate training of such
staff; (7) failing to provide reasonable and necessary support staff and
services to the point that patient care could have been compromised; (8)
failing to reasonably and adequately support Dr. Zarnow in delivering quality
health care services to his patients; and (9) failing to provide reasonable
financial management and control over costs, overhead, and expenses of
operations of the Clinic.

According to the Clinic,
there was no contract to be breached while Dr. Zarnow was still associated with
the Clinic, and the partnership agreement contains no provision giving any
partner the right of continuing association since section 10.02 allowed the expelling
of a partner without cause.  The Clinic
alleged that there was no evidence that the Clinic partners breached any
contract with Dr. Zarnow by terminating him without cause. 

3. Tort Claims 

Dolores also raised claims
against the Clinic for tortious conduct. 
She alleged that the Clinic breached its fiduciary duty to Dr. Zarnow by
failing to properly account for and pay him all salary due and that the Clinic
tortiously interfered with patient relations. 
She further alleged malicious prosecution, intentional infliction of
emotional distress, and invasion of privacy all arising out of the Clinic=s conduct leading to his arrest and public humiliation.

F. The Clinic=s Motion for Summary Judgment








The Clinic moved for summary
judgment on all claims Dolores asserted in this case on the ground that Dr.
Zarnow=s sale of his partnership interest back to the partnership released
the Clinic from any liability pursuant to section 10.03(c) of the partnership
agreement.  The Clinic=s motions also separately addressed Dolores=s individual causes of action on various grounds.  Regarding the breach of contract claim for
illegal and wrongful suspension and termination, the Clinic contended that Dr.
Zarnow was properly suspended and discharged under sections 4.06(h), (k) and
4.08 of the partnership agreement. The Clinic also said the invasion of privacy
claim is not recognized in Texas. The Clinic then moved for a no-evidence
summary judgment on Dolores=s claims of intentional infliction of emotional distress.  The Clinic also listed as a subject of its
summary judgment motion Dolores=s claim for tortious inference with patient relationships.[4]








Dolores=s First Amended Original Petition was filed on November 19, 1999.  The Clinic=s Motion for Summary Judgment and No Evidence Motion for Summary
Judgment were filed on November 30, 2001. 
The Phycor defendants were dismissed on February 8, 2006 because of
bankruptcy.  The trial court announced
its decision to grant the Summary Judgment by letter of April 17, 2006, without
specifying whether the traditional or no-evidence motion was being granted or
the grounds therefor.  On August 1, 2006,
Dolores filed her Second Amended Original Petition.  The final Summary Judgment was filed August 24,
2006.

III. Standards of Review 

A. No-Evidence Motion for
Summary Judgment

After an adequate time for
discovery, the party without the burden of proof may, without presenting
evidence, move for summary judgment on the ground that there is no evidence to
support an essential element of the nonmovant=s claim or defense.  Tex. R. Civ. P. 166a(i).  The motion must specifically state the
elements for which there is no evidence. 
Id.; Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 207
(Tex. 2002).  The trial court must grant
the motion unless the nonmovant produces summary judgment evidence that raises
a genuine issue of material fact.  See
Tex. R. Civ. P. 166a(i) &
cmt.; Sw. Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002).

When reviewing a no evidence
summary judgment, we examine the entire record in the light most favorable to
the nonmovant, indulging every reasonable inference and resolving any doubts
against the motion.  Sudan v. Sudan,  199 S.W.3d 291, 292 (Tex. 2006).  If the nonmovant brings forward more than a
scintilla of probative evidence that raises a genuine issue of material fact,
then a no evidence summary judgment is not proper.  Moore v. K Mart Corp., 981 S.W.2d 266,
269 (Tex. App.CSan Antonio
1998, pet. denied). 








B. Traditional Motion for
Summary Judgment 

A defendant who conclusively
negates at least one essential element of a cause of action is entitled to
summary judgment on that claim.  IHS
Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason, 143 S.W.3d
794, 798 (Tex. 2004); see Tex. R.
Civ. P. 166a(b), (c).  When
reviewing a summary judgment, we take as true all evidence favorable to the
nonmovant, and we indulge every reasonable inference and resolve any doubts in
the nonmovant=s
favor.  IHS Cedars Treatment Ctr.,
143 S.W.3d at 798. 

A defendant is entitled to
summary judgment on an affirmative defense if the defendant conclusively proves
all the elements of the affirmative defense. 
Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223 (Tex.
1999).  To accomplish this, the
defendant-movant must present summary judgment evidence that establishes each
element of the affirmative defense as a matter of law.  Ryland Group, Inc. v. Hood, 924 S.W.2d
120, 121 (Tex. 1996).








When a trial court=s order granting
summary judgment does not specify the ground or grounds relied on for its
ruling, summary judgment will be affirmed on appeal if any of the theories
presented to the trial court and preserved for appellate review are
meritorious.  Provident Life &
Accident Ins. Co. v. Knott, 128 S.W.3d 211, 216 (Tex. 2003); Star-Telegram,
Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995); Harwell v. State Farm
Mutual Ins. Co., 896 S.W.2d 170, 173 (Tex. 1995).  When the trial court=s judgment rests
upon more than one independent ground or defense, the aggrieved party must
assign error to each ground, or the judgment will be affirmed on the ground to
which no complaint is made.  Scott v.
Galusha, 890 S.W.2d 945, 948 (Tex. App.CFort Worth 1994,
writ denied).

IV. Release

Dolores=s first two issues deal with section 10.03 of the partnership
agreement and its applicability to her claims. 
The Clinic moved for traditional summary judgment on all grounds
asserted by Dolores based on the theory that the doctor released any claims he
had against the Clinic when he sold his partnership interest back to the
partnership.  Section 10.03(c) of the
partnership agreement reads as follows:

The
payment to the affected Partner or its representatives under this
Section 10.03 is in complete liquidation and satisfaction of all the rights and
interests of the affected Partner and its representative (and of all Persons
claiming by, through, or under the affected Partner and its representative) in
and in respect of the Partnership, including, without limitation, any
Partnership interest, such Partner=s income interest, any rights
in specific Partnership property, and any rights against the Partnership and
(insofar as the affairs of the Partnership are concerned) against the
Partners.  [Emphasis supplied.]

 








Section 10 defines Aaffected Partner@ as a
partner who (1) Avoluntarily
withdraws@ or (2) Ais expelled from the Partnership for cause@ or (3) Aremains a
Partner after becoming a Bankrupt Partner.@  In its brief, the Clinic
concedes that Dr. Zarnow was terminated from the partnership without cause by a
vote of two-thirds of his partners.

The Clinic initially argues
that Dr. Zarnow voluntarily withdrew from the partnership because the
partnership agreement provides Ano provision for the involuntary acquisition of a partner=s interest . . . when the partner is terminated without cause.  That being the case, so far as the release
provisions of Section 10.03(c), Zarnow voluntarily withdrew from the ownership
of partnership assets represented by his capital account.@  We reject this argument.  Dr. Zarnow was terminated involuntarily by a
vote of at least two-thirds of the partnership partners.  He did not voluntarily withdraw.  Calling a duck a chicken does not make it a
chicken.  It is still a duck.[5]  

Because Dr. Zarnow did not
voluntarily withdraw from the partnership, but instead was terminated without
cause, we hold that section 10.03 of the partnership agreement is inapplicable
to him and therefore cannot operate to release the Clinic of Dolores=s potential claims. 
Consequently, it was not an appropriate ground upon which the trial
court could have granted summary judgment.








We shall now assess whether
there were appropriate grounds on which the trial court could have based its
summary judgment on the individual claims asserted by Dolores.  

V. No-Evidence Motion for
Summary Judgment Analysis 

The Clinic filed its
no-evidence motion for summary judgment and asserted that there was no evidence
of Dolores=s claims of
malicious prosecution and intentional infliction of emotional distress.[6]

A. Malicious Prosecution 

In her sixth issue, Dolores
claims that she presented sufficient evidence to create a genuine issue of
material fact on each element for her malicious prosecution claim.  We disagree. 








To prevail on a claim for
malicious prosecution, Dolores was required to prove that:  (1) a criminal prosecution was commenced
against Dr. Zarnow; (2) the Clinic initiated or procured that prosecution; (3)
the prosecution terminated in Dr. Zarnow=s favor; (4) Dr. Zarnow was innocent of the charges;  (5) the Clinic lacked probable cause to
initiate the prosecution; (6) the Clinic acted with malice; and (7) Dr. Zarnow
suffered damages.  See Richey v.
Brookshire Grocery Co., 952 S.W.2d 515, 517 (Tex. 1997).

There was no evidence that the
Clinic did anything to initiate or procure a prosecution against Dr.
Zarnow.  All of the actors that were
involved in this regard were Phycor employees, not Clinic employees.  Furthermore, the supreme court has expressly
stated that A[a] person
does not procure a criminal prosecution when the decision whether to prosecute
is left to the discretion of another, including a law enforcement official or
the grand jury, unless the person provides information which he knows is false.@  Browning‑Ferris
Indus., Inc. v. Lieck, 881 S.W.2d 288, 292 (Tex. 1994).  Here it was not shown that the Clinic
provided information known to be false, and the decision of whether to
prosecute Dr. Zarnow was left to the discretion of law enforcement and
ultimately the grand jury. 

After examining the entire
record in the light most favorable to Dolores and indulging every reasonable
inference and resolving any doubts against the motion, we hold that Dolores
failed to bring forward more than a scintilla of probative evidence that raises
a genuine issue of material fact.  See  Sudan, 199 S.W.3d at 292; Moore,
981 S.W.2d at 269.  Thus, the granting of
the no evidence summary judgment on this claim was proper.  We overrule Dolores=s sixth issue.  








B. Intentional Infliction of
Emotional Distress  

In her seventh issue, Dolores
claims that she presented sufficient evidence to create a genuine issue of
material fact on each element of her intentional infliction of emotional
distress claim.  We disagree. 

The elements of intentional
infliction of emotional distress are: (1) the defendant acted intentionally or
recklessly; (2) the conduct was extreme and outrageous; (3) the defendant=s actions caused the plaintiff emotional distress; and (4) the
emotional distress that the plaintiff suffered was severe.  City of Midland v. O'Bryant, 18 S.W.3d
209, 216 (Tex. 2000).  To be considered
extreme and outrageous, conduct must be so outrageous in character, and so
extreme in degree, as to go beyond all possible bounds of decency and as to be
regarded as atrocious and utterly intolerable in a civilized community.  Id. at 217. 

Under this cause of action
Dolores claims that alleged damages flow from the ordeal that accompanied the
police investigation involving Dr. Zarnow. However, we agree with the Clinic
that Dolores presented no evidence that the Clinic acted intentionally or
recklessly with regard to this incident. 
The Clinic simply asked law enforcement to investigate what it believed
to be a legitimate safety issue concerning possible explosives and firearms
present in Dr. Zarnow=s
office.  








Dolores contends that Athe Clinic was determined to remove Dr. Zarnow from the partnership
for his refusal to practice medicine in a way that would bolster the financial
condition of the Clinic, regardless of the best interests of his patients.@  However, as discussed above,
under the partnership agreement, the Clinic was allowed to involuntarily
terminate Dr. Zarnow from the partnership with a two-thirds vote of the
partners.  A[A] claim for intentional infliction of emotional distress does not
lie for ordinary employment disputes.@  GTE Sw., Inc. v. Bruce,
998 S.W.2d 605, 612B13 (Tex.
1999).  The mere fact of termination of
employment, even if the termination is wrongful, is not legally sufficient
evidence that the employer=s conduct was extreme and outrageous. 
Sw. Bell Mobile Sys., Inc. v. Franco, 971 S.W.2d 52, 54 (Tex.
1998).  Under these facts, we cannot say
that the Clinic=s conduct
was so outrageous in character, and so extreme in degree, as to go beyond all
possible bounds of decency and as to be regarded as atrocious and utterly
intolerable in a civilized community.   Midland, 18 S.W.3d at 217.

Because there was no evidence
that the Clinic acted intentionally or recklessly or that its conduct was
extreme and outrageous, we overrule Dolores=s seventh issue.   

 

 








VI. Traditional Motion for
Summary Judgment Analysis 

In its traditional motion for
summary judgment, the Clinic asserted as grounds the affirmative defense of
release (which we previously rejected), that the claim of invasion of privacy
as asserted by Zarnow is not a recognized claim in the State of Texas, and that
the claim of illegal and wrongful suspension and termination was barred because
the Clinic was acting under its rights under the partnership agreement.

A. Invasion of Privacy 

In her fourth issue, Dolores
claims that the trial court erred by granting summary judgment in favor of the
Clinic on her invasion of privacy claim. 
The Clinic responds that Phycor employees, not Clinic Employees, were
the ones that entered Dr. Zarnow=s office and discovered firearms. 
Moreover, the Clinic contends that the claim as pled is not a recognized
cause of action in Texas.  Specifically,
the Clinic alleges that Dolores=s invasion of privacy claim is a claim for false light invasion of
privacy.  

The Texas Supreme Court has
described false light invasion of privacy as follows: 

One
who gives publicity to a matter concerning another that places the other before
the public in a false light is subject to liability to the other for invasion
of his privacy if

 








(a)
the false light in which the other was placed would be highly offensive to a
reasonable person, and

 

(b)
the actor had knowledge of or acted in reckless disregard as to the falsity of
the publicized matter and the false light in which the other would be placed.

 

Diamond Shamrock Ref. & Mktg. Co. v.
Mendez, 844 S.W.2d 198, 200 (Tex. 1992)
(analyzing the proof of a false light invasion of privacy even though the court
had not recognized such a tort). 
However, Texas does not recognize a cause of action for false light invasion
of privacy.  Cain v. Hearst Corp.,
878 S.W.2d 577, 578 (Tex. 1994).  

On the other hand, Dolores
claims her cause of action is for invasion of privacy by intrusion into
seclusion.  The three elements that must
be established to sustain this cause of action are:  (1) an intentional intrusion;  (2) upon the seclusion, solitude, or private
affairs of another;  (3) which would be
highly offensive to a reasonable person. 
Doe v. Mobile Video Tapes, Inc., 43 S.W.3d 40, 48 (Tex. App.CCorpus Christi 2001, no pet.).  
The core of this claim is the offense of prying into the private domain
of another, not publication of the results of such prying.  Clayton v. Richards, 47 S.W.3d 149,
153 (Tex. App.CTexarkana
2001, pet. denied).








In other words, the actual
entering of Dr. Zarnow=s office and
desk is what has to be highly offensive to a reasonable person, not the
publicity resulting from the exposure of what was found there.  For this reason, even assuming that Dolores=s claim was for invasion of privacy by intrusion into seclusion, and
that it was Clinic employees that were the actors, we still hold that the trial
court properly granted summary judgment on this claim.  The core of Dolores=s claim here deals not with the offensiveness of the entering of Dr.
Zarnow=s office and desk, but instead with the ordeal that resulted from the
exposure of what was discovered in his office and desk.  Further, Dr. Zarnow was not present in his
office, or even the Clinic, when the intrusion occurred. 

Dr. Zarnow knew there was a
no-firearms policy in place, and it was entirely reasonable for the Clinic to
seek removal of firearms and possible explosives from its premises.  Under these facts, we cannot say that the
intrusion into Dr. Zarnow=s office and
desk would be highly offensive to a reasonable person.  Because the Clinic conclusively negated at
least this one essential element of Dolores=s  cause of action, we hold that
it was entitled to summary judgment on that claim.  IHS Cedars Treatment Ctr., 143
S.W.3d at 798.  Accordingly, we overrule
Dolores=s fourth issue.    

B. Breach of Contract ClaimCSuspension and Termination  








In her fifth issue, Dolores
claims the Clinic breached its contract with Dr. Zarnow by wrongfully
suspending and terminating him from the partnership.  Under section 10.02 of the partnership
agreement, the Clinic had the absolute right to expel Dr. Zarnow without cause
by a vote of two-thirds of the partners. Again, we note that Dr. Zarnow was a
Clinic partner and that he signed the partnership agreement.  We fail to see how Dolores would have any
cause of action against the Clinic for its simply exercising its rights under
the agreement Dr. Zarnow signed. 
Accordingly, we hold that summary judgment was properly granted on this
claim and overrule Dolores=s fifth issue. 

VII. Final Summary Judgment 

Dolores contends in her third
issue that the trial court erred by rendering a final summary judgment because
the Clinic did not prove its defense of release as a matter of law.  As previously discussed, although the release
defense addressed all of Dolores=s claims, it did not warrant the granting of summary judgment.  However, the Clinic=s motion also addressed Dolores=s individual claims on other grounds with one exception.  

A. Pretermination Breach of
Contract and Fraudulent Inducement Claims 

Dolores argued below that the
Clinic breached its contract in various ways while Dr. Zarnow was still
employed by the Clinic.  Now, she asserts
that the Clinic=s motion for
summary judgment does not address these claims and thus the trial court could
not have rendered final summary judgment.








First, Phycor, not the
Clinic, was the management company that ran the day-to-day business side of the
practice. Second, there was no contract to which Dr. Zarnow was a party that
could have been breached while he was still associated with the Clinic.  Nowhere in her first amended petition does
Dolores=s state exactly what contract was allegedly breached.  A close reading of Dolores=s claims here, many of which relate to the day-to-day business aspects
of the practice, reveals that they could only implicate the contract and
service agreement that were executed by the Clinic and Phycor when the Clinic
was sold.  Dolores also claimed that the
Clinic was fraudulently induced into these agreements by Phycor.    








Privity in contract provides
a party with standing to maintain an action. 
See, e.g., Interstate Contracting Corp. v. City of Dallas, 135
S.W.3d 605, 618 (Tex. 2004) (citing Brown v. Todd, 53 S.W.3d 297, 305
(Tex. 2001) (under Texas law, standing limits subject matter jurisdiction to
cases involving a distinct injury to the plaintiff and a real controversy
between the parties, which will be actually determined by the judicial
declaration sought)).  Privity is
established by proving that the defendant was a party to an enforceable
contract with either the plaintiff or a party who assigned its cause of action
to the plaintiff.  See Conquest
Drilling Fluids v. Tri‑Flo Int=l, 137 S.W.3d 299, 308 (Tex. App.CBeaumont 2004, no pet.).  Here
Dr. Zarnow was not a party to the contract or agreements that Dolores now
claims were entered into due to fraudulent inducement and subsequently
breached.  She therefore lacks privity of
contract and consequently lacks standing to assert these claims.    

Standing, as a component of
subject matter jurisdiction, cannot be waived and may be raised for the first
time on appeal by the parties or by the court. 
Tex. Ass=n of Bus. v.
Tex. Air Control Bd., 852 S.W.2d 440, 445B46 (Tex. 1993).  Because Dr.
Zarnow, and Dolores as administrator of his estate, did not have standing to
assert these claims, we dismiss these portions of Dolores=s third issue.     

B. Tortious Interference 

In her petition, Dolores
asserted a claim for tortious interference with business relations.  Specifically, Dolores claimed that the Clinic
Atortiously and maliciously interfered with the doctor/patient relationship
Dr. Zarnow ha[d] established with countless patients in the North Texas area.@  Although the Clinic listed
Dolores=s tortious interference claim in its motion for summary judgment, it
did not address the claim or show why summary judgment should be granted on
that claim.  








If a defendant moves for
summary judgment on only some of the claims asserted by the plaintiff, but the
trial court renders judgment that the plaintiff take nothing on all claims
asserted, the judgment is finalCerroneous, but final.  Jacobs
v. Satterwhite, 65 S.W.3d 653, 655 (Tex. 2001).  Because the tortious interference claim was
not addressed in the Clinic=s motion, summary judgment on that claim was erroneous.  Id.; see also Black v. Victoria
Lloyds Ins. Co., 797 S.W.2d 20, 27 (Tex. 1990) (AA summary judgment movant may not be granted judgment as a matter of
law on a cause of action not addressed in a summary judgment proceeding.@).  Therefore, we sustain the
portion of Dolores=s third
issue that relates to her tortious interference claim and reverse and remand on
that claim. 

VIII. Conclusion

Having sustained a portion of Dolores=s third issue and
overruled each of her remaining issues, we affirm in part and reverse and
remand in part to the trial court for consideration of the tortious
interference claim.       

 

 

 

BOB MCCOY

JUSTICE

 

PANEL B:   LIVINGSTON, WALKER, and MCCOY, JJ.

 

DELIVERED:
August 31, 2007











[1]See Tex.
R. App. P. 47.4.





[2]Thermite is a chemical mixture that
can be used as a component of an incendiary device.  





[3]After Dr. Zarnow filed his original
petition and after the Clinic filed its motion for summary judgment Dr. Zarnow
died on January 28, 2006.  Dolores chose
to continue pursuing his claims as the administrator of Dr. Zarnow=s estate.  Accordingly, we will refer to ADolores=s claims.@ 






[4]The Clinic also moved for summary
judgment on claims that were later dismissed.





[5]See
Tidelands Marine Serv. v. Patterson, 719 F.2d 126, 128 n.3 (5th
Cir. 1983). 





[6]In
her first amended original petition Dolores also asserted a breach of fiduciary
duty claim based upon salary complaints. 
The Clinic also moved for no evidence summary judgment on this
claim.  However, it appears that Dolores
has abandoned this cause of action on appeal.